No. 23-1859

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

UNITED STATES,
*Appellee,*

v.

ANTONIO CASILLAS-MONTERO, a/k/a Stone City Kennel,
*Defendant - Appellant.*

Appeal from the United States District Court for the District of Puerto Rico
No. 22-CR-437 (Hon. Silvia L. Carreno-Coll)

**ANSWERING BRIEF FOR THE UNITED STATES**

W. STEPHEN MULDROW
*U.S. Attorney*

JONATHAN L. GOTTFRIED
*Assistant U.S. Attorney*
U.S. Attorney's Office
District of Puerto Rico

TODD KIM
*Assistant Attorney General*

RACHEL HERON
ETHAN C. EDDY
ALLEN M. BRABENDER
THEKLA HANSEN-YOUNG
*Attorneys*
Env't and Nat. Res. Div., U.S. Dep't of Justice
PO Box. 7415, Washington, D.C. 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................i

TABLE OF AUTHORITIES ........................................................................................iii

INTRODUCTION.........................................................................................................1

STATEMENT OF JURISDICTION ............................................................................3

STATEMENT OF THE ISSUES .................................................................................3

STATEMENT OF THE CASE ....................................................................................3

    A.    The federal animal fighting provisions. ......................................................3

    B.    Casillas extensively participated in the dog fighting industry....................4

    C.    Casillas pleaded guilty and was sentenced to an 84-year term of imprisonment. ..................................................................6

SUMMARY OF ARGUMENT ...................................................................................14

ARGUMENT ...............................................................................................................17

I.    The sentence was procedurally reasonable. ...........................................................17

    A.    Legal Standards and Standard of Review ....................................................18

    B.    The district court fully explained the reasons it imposed the 84-month sentence on Casillas. ..................................................20

II.    The sentence is substantively reasonable. ............................................................24

    A.    Legal Standards and Standard of Review ....................................................24

    B.    Casillas's conduct was extreme. ..................................................................25

    C.    Deterrence justifies a variance sentence here.............................................28

    D.    Casillas's conduct was like that of other defendants who received above-Guidelines sentences.........................................29

i

III.  The sentence violated neither the Guidelines' concept of grouping
      nor the constitutional protection against double jeopardy. ................................ 33

      A.   Legal Standards and Standard of Review ................................................... 34

      B.   The district court complied with the Guidelines. ...................................... 35

      C.   Consecutive sentences for the conspiracy and substantive
           counts did not violate double jeopardy principles ................................... 37

      D.   The district court correctly imposed consecutive sentences
           for the separate offenses identified in Counts 3 and 5. ........................... 38

CONCLUSION ........................................................................................................... 42

CERTIFICATE OF COMPLIANCE ........................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Bell v. United States*,
349 U.S. 81 (1955)...................................................................................35, 41, 42

*Gall v. United States*,
552 U.S. 38 (2007)....................................................................................17, 18, 25

*Hernandez v. Williams*,
829 F.3d 1068 (9th Cir. 2016) ................................................................ 39

*Kimbrough v. United States*,
552 U.S. 85 (2007)................................................................................... 22

*Setser v. United States*,
566 U.S. 231 (2012)................................................................................. 37

*Shular v. United States*,
589 U.S. 154 (2020)................................................................................. 42

*United States v. Berry*,
09-CR-30101-MJR, 2010 WL 1882057 (S.D. Ill. May 11, 2010), *aff'd sub nom. United States v. Courtland*, 642 F.3d 545 (7th Cir. 2011) ....................................................4, 40

*United States v. Chadwick*,
7:16-cr-122, 2017 WL 6055384, *2-3 (E.D.N.C. Dec. 1, 2017) 796 Fed. App'x 795 (4th Cir. Dec. 12, 2019) ............................................................................30, 31

*United States v. Clogston*,
662 F.3d 588 (1st Cir. 2011) ................................................................... 24

*United States v. Contreras-Delgado*,
913 F.3d 232 (1st Cir. 2019) .................................................. 17, 22. 24, 25

*United States v. Del Valle-Rodriguez*,
761 F.3d 171 (1st Cir. 2014) ................................................................... 24

*United States v. Dávila–González*,
595 F.3d 42 (1st Cir. 2010)...................................................................... 18

*United States v. Flores-Gonzalez,*
   86 F.4th 399 (1st Cir. 2023) ............................................................. 22

*United States v. Flores-Rivera,*
   56 F.3d 319 (1st Cir. 1995) ............................................................... 38

*United States v. Gallardo-Ortiz,*
   666 F.3d 808 (1st Cir. 2012) ............................................................. 25

*United States v. Garay-Sierra,*
   832 F.3d 64 (1st Cir. 2016) .......................................................... 18, 19

*United States v. Garcia-Torres,*
   341 F.3d 61 (1st Cir. 2003) ............................................................... 37

*United States v. González-Barbosa,*
   920 F.3d 125 (1st Cir. 2019) ............................................................. 32

*United States v. Gordon,*
   875 F.3d 26 (1st Cir. 2017) ............................................................... 35

*United States v. Grant,*
   114 F.3d 323 (1st Cir. 1997) ............................................................. 41

*United States v. Hargrove,*
   701 F.3d 156 (4th Cir. 2012) ........................................................ 22, 30

*United States v. Jarvis,*
   606 F.3d 552 (8th Cir. 2010) ............................................................. 37

*United States v. King,*
   741 F.3d 305 (1st Cir. 2014) ............................................................. 24

*United States v. Martin,*
   520 F.3d 87 (1st Cir. 2008) ............................................................... 28

*United States v. Medina-Villegas,*
   700 F.3d 580 (1st Cir. 2012) ............................................................. 19

*United States v. Meyers,*
No. 21-13891, 2024 WL 914874 (11th Cir. Mar. 4, 2024) ........................................... 33

*United States v. Nueci-Pena,*
711 F.3d 191 (1st Cir. 2013) ...................................................................... 35

*United States v. Pagan-Walker,*
877 F.3d 415 (1st Cir. 2017) ...................................................................... 28

*United States v. Richardson,*
7:16-cr-122, 2017 WL 6055773, *2-3 (E.D.N.C. Dec. 1, 2017), 796 Fed. App'x 795
(4th Cir. Dec. 12, 2019) ........................................................................... 30

*United States v. Rivera-Gonzalez,*
776 F.3d 45 (1st Cir. 2015) ....................................................................... 24

*United States v. Rodriguez,*
525 F.3d 85 (1st Cir. 2008) ....................................................................... 40

*United States v. Romero,*
906 F.3d 196 (1st Cir. 2018) ...................................................................... 29

*United States v. Ruiz-Huertas,*
792 F.3d 223 (1st Cir. 2015) .................................................................. 19, 25

*United States v. Smith,*
919 F.3d 1 (1st Cir. 2019) ......................................................................... 35

*United States v. Vargas-Garcia,*
794 F.3d 162 (1at Cir. 2015) ...................................................................... 18

*United States v. Vázquez-Martínez,*
812 F.3d 18 (1st Cir. 2016) ....................................................................... 25

*United States v. Wright,*
101 F.4th 109 (1st Cir. 2024) ................................................................. 18, 19

## Statutes

Animal Welfare Act,
7 U.S.C. § 2156(a) ....................................................... 1, 4, 7, 35, 36, 39

7 U.S.C. § 2156(b)................................................1, 4, 7, 35, 36, 38, 40

18 U.S.C. § 49...............................................................1, 4, 7, 36, 42
18 U.S.C. § 371.......................................................................1, 35, 36
18 U.S.C. § 924(c) .......................................................................... 40
18 U.S.C. § 3231 ............................................................................... 3
18 U.S.C. § 3553(a)................................................17, 18, 23, 25, 28, 29
18 U.S.C. § 3584(a) ......................................................................... 37

28 U.S.C. § 1291 ............................................................................... 3

## Rules and Guidelines

Fed. R. App. P. 4(b)(1)...................................................................... 3

U.S.S.G. § 3D1.2................................................................34, 36
U.S.S.G. § 3D1.2 Comment n. 5 ................................................... 34
U.S.S.G. Ch. 3, Pt. D, Refs & Annos ........................................... 34
U.S.S.G. § 5G1.2(d).................................................................34, 36, 37

## Other Authorities

Animal Welfare Act Amendments of 1976,
    Pub. L. No. 94-279, 90 Stat. 417 (1976) .................................... 39

Food, Conservation, and Energy Act of 2008,
    Pub. L. No. 110-234, § 14207, 122 Stat. 923, 1461-62 (2008).................................... 4

H.R. Rep. No. 94-801 (1976) reprinted in 1976 U.S.C.C.A.N. 758 ............................... 4

# INTRODUCTION

Defendant Antonio Casillas Montero appeals his sentence from a final judgment entered upon his conviction after pleading guilty. Casillas pled guilty to three counts: one count of conspiracy to sponsor and exhibit dogs in an animal fighting venture in violation of the Animal Welfare Act, 7 U.S.C. §§ 2156(a)(1)-(2), 2156(b), 18 U.S.C. §§ 49, 371 (Count 1), and two counts of possessing a dog for use in an animal fighting venture, also in violation of the Animal Welfare Act, 7 U.S.C. § 2156(b) (Counts 3 and 5). In the plea agreement, the parties stipulated that Casillas had operated "Stone City Kennels," which was internationally renowned among dog fighters and had participated in more than 150 dogfights in the United States, Ecuador, Colombia, Mexico, Peru, and the Dominican Republic. Casillas further stipulated that he been engaged in dog fighting for 35 years, training multiple dogs at a time, used steroids on them, and preferred to let the dogs die in the dog fighting pit rather than removing a losing dog from a fight.

The parties' plea agreement did not provide for a recommended offense level; and the guideline calculation for Casillas's crimes would have resulted in a 12-to-18-months term of imprisonment for each of the three counts. After a sentencing hearing that lasted several hours during which the Government presented testimonial, documentary and digital evidence (including audio recordings of Casillas detailing dog fights), the government asked for an above-guidelines sentence of ten years' imprisonment. The government cited as justification the extraordinary cruelty to animals caused by Casillas (above the violence inherent in dogfights), Casillas's

1

leadership and mentorship role in the dog fighting world, his role in breeding and selling fighting dogs (in addition to fighting them himself), the greater need for general deterrence in light of an environment conducive to dog fighting in Puerto Rico, and the extraordinary number of fights and long duration of Casillas's involvement in dog fighting. Adopting several of those reasons, as well as noting Casillas's lack of remorse during his sentencing allocution for the suffering he inflicted on animals, the district court varied upwards from the guidelines range and sentenced Casillas to a term of imprisonment of 36 months for Count 1, 24 months for Count 3, and 24 months for Count 5, to be served consecutively for a total term of 84 months, or seven years.

Casillas asserts on appeal that his sentence is procedurally and substantively unreasonable, and runs afoul of double jeopardy principles. It was neither. Based on the parties' Stipulation of Facts, the uncontested portions of the Presentence Investigation Report, and the copious evidence presented during the sentencing hearing, the district court properly considered the totality of Casillas's circumstances, including his extraordinary participation in the breeding, training, and fighting of dogs, as well as his extreme cruelty towards his dogs and his lack of remorse. The court fully explained its reasons for the upward variance. Because the 84-month term of imprisonment is procedurally and substantively reasonable and does not run afoul of double jeopardy protections, this Court should affirm the sentence.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. The district court entered an initial and amended judgment on September 22, 2023. Addendum (ADD-) 1-7; ADD-10-16. Casillas timely filed his notice of appeal 10 days later, on October 2, 2023. ADD-8. The next day, on October 3, 2023, Casillas moved to amend his notice of appeal, which the district court granted. Appendix (APP-) 14-15. Casillas filed his amended notice of appeal on October 6, 2023. ADD-17. This Court has jurisdiction under 28 U.S.C. § 1291. *Cf.* Fed. R. App. P. 4(b)(1).

## STATEMENT OF THE ISSUES

1.      Whether the district court adequately explained its decision to upwardly vary from the guidelines range when imposing the 84-month sentence.

2.      Whether Casillas has established that his total sentence of 84 months was substantively unreasonable, when the district court considered all the relevant factors, including the extreme cruelty and extraordinary nature of the offenses, before imposing the sentence.

3.      Whether the district court's decision to impose consecutive sentences for the three distinct counts complied with the guidelines and the Constitutional protection against double jeopardy.

## STATEMENT OF THE CASE

### A.      The federal animal fighting provisions.

In 1976, Congress sought to address the "grisly business" of dog fighting, in which dogs are made to viciously attack and kill each other as a form of sadistic

"entertainment." H.R. Rep. No. 94-801, at 9 (1976), reprinted in 1976 U.S.C.C.A.N. 758, 1976 WL 13854; APP-223; *see also* APP-89-105 (expert testimony on dog fighting presented at sentencing). "The lives of fighting dogs are not to be envied." *United States v. Berry*, 09-CR-30101-MJR, 2010 WL 1882057, at *4 (S.D. Ill. May 11, 2010), *aff'd sub nom. United States v. Courtland*, 642 F.3d 545 (7th Cir. 2011). These dogs are mistreated, conditioned, and trained to develop aggression and fighting ability. APP-93-98, 223. Dog fights can last for more than an hour, and during fights dogs sustain various injuries, including severe bruising, deep puncture wounds, and broken bones. APP-104-05, 223-24. Losing dogs often die from these injuries, as well as shock, dehydration, or exhaustion. APP-104-05, 223-24. Congress thus amended the Animal Welfare Act to make it unlawful to "knowingly sponsor or exhibit an animal in an animal fighting venture." 7 U.S.C. § 2156(a)(1). An "animal fighting venture" involves a fight "between at least 2 animals for purposes of sport, wagering, or entertainment." *Id.* § 2156(f)(1).

Congress also prohibited the activities that support organized animal fighting operations, making it unlawful to "knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an animal fighting venture." 7 U.S.C. § 2156(b). Congress has strengthened these prohibitions several times, and it increased the penalty for violating 7 U.S.C. § 2156(a)(1) or (b) from a three-year felony to a five-year felony in 2008. Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-234, § 14207, 122 Stat. 923, 1461-62 (2008); *see also* 18 U.S.C. § 49.

### B.    Casillas extensively participated in the dog fighting industry.

For more than 35 years and through 2022, Casillas operated Stone City Kennel, which bred and fought dogs, in the United States and internationally. APP-38. Casillas

started in the dog fighting industry at age 17 and participated in over 150 fights in locations that include Puerto Rico, Mexico, Ecuador, Peru, the Dominican Republic, New York, and New Jersey. APP-38; APP-180-81; U.S. Supplemental Appendix (U.S. Supp. App.) 117-18. He was a legend in the dog fighting industry, so much so that he was treated as celebrity, even autographing break sticks (that are used to break the bite of fighting dogs) and providing interviews. *See, e.g.,* APP-106-08, 221-22, 225.

To train dogs for fights, he chained them to treadmills to walk or run for miles. APP-38; APP-144-48; U.S. Supp. App. 15-19, 91-100, 118. He also used steroids on his fighting dogs and fought his dogs at his residence in Humacao, Puerto Rico. APP-38; U.S. Supp. App. 118.

Casillas sold pit bull-type dogs for animal fighting ventures. APP-38; U.S. Supp. App. 118. He kept fighting dog pedigree records, APP-226, which he provided to potential purchasers of his dogs. APP-39-40; APP-149-53, 198. He sold one female "champion" (a dog who had won three fights) for approximately $20,000. U.S. Supp. App. 118. Other dog sales were negotiated for prices ranging from $1,000 to $10,000 with shipment to the mainland United States via airplane cargo for $200, in addition to the veterinary and kennel expenses. U.S. Supp. App. 118-19; APP-38. Casillas encouraged potential buyers to fly to Puerto Rico to pick up the dogs in his possession. U.S. Supp. App. 118-19; APP-38-39; *see also* APP-145-48, 152-53.

In addition to breeding and fighting his own dogs, Casillas perpetuated this criminal conduct by mentoring others. APP-226. Indeed, he was a sought-after teacher. APP-141, 221-22, 225. Through Stone City Kennel, he also advertised dog fighting in the Dominican Republic, including one fight in April 2019. APP-132-34, 222-23; APP-

39. That match included 24 fights, a high number that is unprecedented according to expert testimony that a government agent provided at sentencing. APP-132-34, 222-23.

Casillas's participation in the dog fighting industry was not only extraordinary in terms of its scope and length, but he was also cruel even relative to industry standards. APP-180-81, 222-23. His practice was to let losing dogs die in a fight, rather than removing them and treating their injuries. APP-39; U.S. Supp. App. 119; APP-173-74, 180-81. In March 2018, for example, Casillas traveled from Puerto Rice to the Dominican Republic to fight a dog. The dog was injured during the fight and died afterwards. U.S. Supp. App. 119. Casillas explained during a Facebook conversation that his dog lost due to a nosebleed that never stopped, and he chose to let the dog bleed to its death rather than stop the fight to save the dog. APP-142-43, 222. In July 2021, he participated in another dog fight in the Dominican Republic. APP-222; APP-40. Video footage presented to the district court at sentencing showed Casillas's dog after the fight. The dog was breathing in agony, and no one attempted to alleviate its suffering. U.S. Supp. App. 8-13; APP-170-72, 176-78; APP-222. The dog later died from the injuries sustained during the fight. APP-222.

### C. Casillas pleaded guilty and was sentenced to an 84-year term of imprisonment.

In September 2022, Casillas indicated to an undercover federal agent that he was part of Stone City Kennel, had participated in more than 150 dog fights nationally and internationally, and had been involved in dog fighting for more than 35 years. APP-40. He told the agent that he currently had three females and two males with dog fighting lineages, and that the two males could be sold for $2,000 each. APP-40.

He was indicted on five counts by a grand jury on October 6, 2022. APP-4. He was arrested the same day and temporarily detained pending further proceedings. APP-4-5. The government moved to detain him without bail pending trial and Casillas informed the court that he would not be seeking bail. The court therefore ordered him to remain detained pending trial and remanded him into the custody of the Bureau of Prisons. APP-6.

In May 2023, Casillas pleaded guilty to three counts (Counts 1, 3 and 5) relating to dog fighting in violation of the Animal Welfare Act, 7 U.S.C. §§ 2156(a)(1)-(2), 2156(b). APP-28-43; *see also* U.S. Supp. App. 102-34. The maximum sentence for each count is 5 years. *See* 18 U.S.C. § 49(2). The remaining two counts (Counts 2 and 4) were dismissed as a result of the plea agreement.

The Government argued for an upward variance sentence of 10 years based on numerous factors, including (1) Casillas's participation in decades of illegal dogs fights; (2) the high number dogfights in which he participated, (3) the national and international scope of Casillas's dog fighting, (4) the greater need for general deterrence in light of an environment conducive to dog fighting in Puerto Rico, (5) Casillas's promotion of dog fights, (6) Casillas's reputation as a "Caribbean legend" in the dog fighting world, (7) his teaching of dog fighting training techniques to others, (8) his sale of dogs that were used by others in dogfights, and (9) his inhumane tactic of never picking up a dog from a fight. *See, e.g.,* U.S. Supp. App. 1-101. The government argued that his conduct was on the extreme end of the spectrum of cruelty in an already cruel form of animal abuse.

The district court held a sentencing hearing on September 22, 2023, in which two agents testified for the government. One agent, who was certified as an expert regarding cell phone extractions and other forensic digital evidence, confirmed that he had extracted information from Casillas's cell phone demonstrating Casillas's involvement in the dog fighting industry. APP-50-74. The other agent was certified as an expert on dog fighting and testified both on dog fighting generally and on Casillas's dog fighting activities. APP-88. The agent specifically testified during the sentencing hearing: that it was "very uncommon" for a dog fighter to have a practice of consistently letting losing dogs die; that "[t]his is by far the, as far as what's documented, the longest involvement and probably the farthest-reaching person that I've been involved in"; that, in the agent's sixty dog fighting investigations, he has never had one with an international reach that covered the United States, Mexico, Peru, Ecuador and the Dominican Republic; and that he had not had a case where the dog fighter had more than 150 matches. APP-180-81. The agent also explained that dog fights can "last three hours." APP-95.

The government also presented evidence of the following in support of its 10-year sentence request:

- Excerpts from Casillas's Facebook account in which he provided advice to dog fighters from India and throughout the world on the use of steroids, exercise regimens for dogs chained to treadmills, feeding protocols, and other training details. *See* APP-137-40, 145-46, 202, 226; U.S. Supp. App. 38-40, 48-50.

- Casillas's international clientele. For example, in one Facebook chat, he discussed moving dogs across the U.S.-Mexican border. *See, e.g.,* APP-222. Inquiries for his dogs in Puerto Rico were received from Europe, mainland United States, and India. *See, e.g.,* APP-145-48. In another message he discusses sending dogs to Ecuador where he has "friends that work them well." U.S. Supp. App. 79; *see also* U.S. Supp. App. 25-28, 100 (discussing shipping dogs).

- Images from Casillas's Facebook account of dogs chained to treadmills. U.S. Supp. App. 15-19, 91-100.

- Casillas publicizing and organizing dog fights, including one in the Dominican Republic in April 2019. *See* APP-131-34; APP-135 and U.S. Supp. App. 73 (explaining passport/visa requirements for a dog-fighting attendee to the Dominican Republic); U.S. Supp. App. 76.

- An interview with Casillas in a dog-fighting publication in which Stone City Kennels is described as "a household name" in the dog-fighting world. APP-106-08.

- A Facebook exchange from 2022 in which one person describes Casillas as "a Caribbean legend," to which Casillas responds, "I will always have some [fighting dogs] even if i not active in the square" APP-130. In another conversation, an admirer in Puerto Rico writes to him: "I would like at some point . . . to be able to visit your Yard if possible.  And be able to meet one of the biggest of the breed." APP-124; *see also* U.S. Supp. App. 70 (conversation in which someone expresses that they know Stone City).

- Casillas providing evidence of pedigrees to dogfighters, thereby establishing dog-fighting lineage and perpetuating the sport. *See, e.g.,* APP-127-31, 150-54; U.S. Supp. App. 30, 35, 52-59, 67, 83.

- An audio recording from WhatsApp from Casillas's phone in which he stated: "Listen, the little dog is fighting with a two-time winner, who was supposedly an assassin. . . . But you know that I really leave the dogs [in] until, until the last [moment], you know what I mean? I mean, I leave the dogs up to where, definitely, the dogs are not, they're not going to come out. You know how I think about, about that, you know what I mean?" *See* APP-172-74.

- A Facebook exchange in 2018 in which one person describes a dog fight in Indonesia. In a later conversation, Casillas was describing a fight and was asked "Did u picked [sic] up or dog died?". APP-142. Casillas responded, "I don't pick up." *Id.*; U.S. Supp. App. 14, 84.

- An audio recording from WhatsApp from Casillas's phone in which he described in detail one of his fights: "Wherever that dog stuck its mouth it drew blood. And that's the, that's the truth. Listen, they give us a big strike on the nose which, well. . . You know what happens, after that when one, when one suffers that major strike and the dog does not coagulate, you know what I mean? Or it can be that it can't coagulate it, you know what I mean? Because he received a strike on the shoulder, and the dog coagulated. And he landed. . . he got in one or two strikes but then he got that one on the nose. And from there it gave a couple of more strikes, vein strikes, and it struck a heavy heavy vein strike, real nice on the shoulder, but he was already running

with that vein strike in the nose. And the reality is, well you know how it is when dogs bleed so much blood like that. You know, they deteriorate." *See* APP-175.

- Casillas's negotiating sales of fighting dogs for thousands of dollars. APP-152-53; U.S. Supp. App. 67-68, 96-100.

- The poor condition of the dogs seized from Casillas's property based on medical reports, a video recording and photos. The dogs were chained to stakes in the ground outdoors and suffered from heartworm, intestinal parasites, body sores, ear infections, jaw clamping, and pustules. *See* APP-97, 226-27; U.S. Supp. App. 20-23, 87-89.[1]

Both the government and defense presented arguments. APP-195-213, 217-18. The defense requested a sentence within the guideline range. APP-207-08.

After Casillas's sentencing allocution, the district court observed that Casillas "continue[d] to call" dog fighting "a sport" and was "repentant because [he was]

---

[1] The Presentence Investigation Report also contained the following description of the dogs found on his property, which Casillas did not object to:

> The first is tied with a heavy metal chain to the ground and a plastic container with the lid half cut is laying on the side. There is a water bowl without water inside. There is also no shelter from the sun or rain aside from the plastic container. The dog had no nails in the front two paws. A second dog is also tied with a heavy chain to the floor and his water bowls are filled with green water from visible moss. A third dog had missing patches of hair round the neck and the skin was red and filled with blisters. A fourth dog whose hair is black was filled with white marks throughout his body. His bow[l]s were filled with brown water.

Presentence Investigation Report 7, ¶ 24, June 27, 2023, ECF No. 88.

caught[,] not because [he] actually realized that what [he] did was wrong" and caused "pain and suffering" to animals for more than 30 years. APP-215-16.[2] When the court expressed concern over Casillas's lack of remorse over the pain he caused to animals and asked whether he had anything further to say, Casillas said that he did not. APP-216-17.

The court calculated the applicable guideline range under U.S. Sentencing Guideline Section 2E3.1(a)(1). APP-219-20. The three offenses were grouped. Based on a total offense level of 13 and a Criminal History Category of I, the guideline imprisonment range for the offenses ranged from 12 to 18 months with a fine range of $5,500 to $55,000, plus a supervised release term of up to three years. APP-220. Application Note No. 2 to Section 2E3.1(a)(1) explains that the base offense levels "reflect that an animal fighting venture involves one or more violent fights between animals and that a defeated animal is often severely injured in the fight, dies as a result of the fight, or is killed afterwards," but provides that an "upward departure may be warranted if the offense involved extraordinary cruelty to an animal beyond the violence inherent in such a venture." APP-224.

The court noted that "other than the criminal dog fighters in America, every other person in America would be shocked beyond belief that you could do what the defendant did and come out with a federal sentence of 12 to 18 months." Statement of Reasons 4, Sept. 22, 2023, ECF No. 106. As other courts have done, the court here

---

[2] This observation is consistent with Casillas's probation interview, where he stated that "it is impossible to force dogs to fight" (suggesting that the fights were somehow their choice) and asserted—inconsistently with the stipulation of facts in his plea agreement—that "dogs that lost fights were given away." ECF No. 88 ¶ 34.

"express[ed] its dissatisfaction with the irrationality of the animal fighting guideline [p]rovision," *id.*, and further explained that the "guidelines do not properly reflect the seriousness of the offenses committed" here because "the facts of this case are extreme." APP-225. Specifically, "the offense involved extraordinary cruelty to an animal beyond the violence inherent in such a venture (such as by killing an animal in a way that prolongs the suffering of the animal)." Statement of Reasons 4, Sept. 22, 2023, ECF No. 106. Casillas's participation in dog fighting was also extreme. The court noted that he was considered a "legend" in the dog fighting world, "engaged in extreme cruelty," participated in more than 150 fights over 35 years, and admitted to letting dogs die from their wounds without making any attempts to alleviate their suffering. *Id.* The district court found that "[i]n this case, the number of fights and the duration of Mr. Casillas's involvement is extraordinary in nature." APP-224.

The district court accordingly varied upwards from the guideline range and sentenced Casillas to a term of imprisonment of 36 months for Count 1, 24 months for Count 3, and 24 months for Count 5, to be served consecutively for a total sentence of 84 months. ADD-11; APP-228. The court imposed an assessment of $100.00 as to each count, for a total of $300.00; a fine of $5,500.00; and a term of supervised release of 3 years for each count, to be served concurrently with each other. ADD-12, 15.

In imposing the sentence, the court also explained that it considered the plea agreement, the Presentence Investigation Report, the guideline calculation, the sentencing memorandums filed by the parties, and the "defendant's allocution in which his statement demonstrated lack of acceptance of responsibility for his actions in making animals suffer." Statement of Reasons 4, Sept. 22, 2023, ECF No. 106. The

court additionally considered Casillas's family circumstances, personal characteristics, and background, including his age, health issues, and his criminal history. *Id.*; APP-221-22.

The court ultimately determined that the variance was necessary to reflect the nature, circumstances, and seriousness of the offenses, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant, while at the same time considering the history and characteristics of the defendant. Statement of Reasons 3, Sept. 22, 2023, ECF No. 106. The court fully explained its reasoning both when it sentenced Casillas and in its statement of reasons. APP-219-233; Statement of Reasons 4, Sept. 22, 2023, ECF No. 106.

The court entered judgment and an amended judgment on September 22, 2023. ADD-1-7; ADD-10-16.

Casillas appealed on October 2, 2023, and amended his notice of appeal on October 6, 2023. ADD-8; ADD-17.

## SUMMARY OF ARGUMENT

Casillas challenges his 84-month (7-year) sentence on appeal as being procedurally and substantively unreasonable, as well as in violation of double-jeopardy principles. This Court should reject each of these three claims and affirm the 84-month sentence as a reasonable exercise of the district court's discretion.

1. The sentence was procedurally reasonable. The district court conducted an individualized assessment of Casillas's criminal conduct and balanced the need for deterrence with factors weighing in favor of leniency, such as his personal circumstances and health issues. The court thoroughly detailed the specific facts that

supported the imposition of the sentence, including Casillas's extreme cruelty and extensive participation in dog fighting. He engaged in dog fighting activities for more than 35 years, during which time he participated in more than 150 fights, both in the United States and internationally. He trained dogs by forcing them to walk or run on treadmills for hours, and chaining them for much of their lives to heighten their aggression. He made it a practice to never save a dog from a fight, leaving his losing dogs to die from their injuries. Casillas also helped perpetuate dog fighting by mentoring others (including promoting the use of steroids), organizing and publicizing dog fights, and by maintaining the pedigrees of fighting dogs. He sold dogs for profit, and four dogs were found on his property in deplorable conditions. The court explained that all of these facts lead it to conclude that the guideline range did not appropriately reflect the extreme circumstances present here and that an upward variance was appropriate. This explanation was more than sufficient.

2. The sentence was also substantively reasonable. The district court has broad discretion in determining what sentence to impose. It acted within this discretion when it determined that Casillas's extreme conduct warranted an upward variance. Casillas's suggestion on appeal that his conduct was not so extreme may be easily rejected when evidence presented at sentencing showed that it was very unusual for dog handlers to decline to save their losing dogs during a fight and that the number of fights that Casillas had participated in and the duration and scope of his involvement in dog fighting was beyond anything the government's experienced dog fighting expert witness had seen. It was also reasonable for the district court to consider the general deterrence aim that an 84-month term of imprisonment would serve. The statute provides for such

consideration and the record shows that the district court did not overweight this factor, instead thoroughly considering the individual circumstances of Casillas's crime. Finally, the 84-month term did not result in a sentencing disparity between Casillas and others convicted of dog fighting. When asking for the court to impose a 10-year sentence, the government cited cases showing the lengthy and above-guideline sentences of defendants similarly situated to Casillas in that their participation in dog fighting activities was unusual and broad in scope. And while it is true, as Casillas argues, that some of those cases also involved other gun or drug crimes, the district court noted this distinction and considered it in imposing a sentence that was 36 months lower than what the government had requested.

3.       The imposition of consecutive sentences did not result in more than one punishment for the same offenses in violation of the guidelines or constitutional prohibitions against double jeopardy. Count 1 charged Casillas for conspiracy to engage in dog fighting and possess dogs for dog fighting purposes, whereas Counts 3 and 5 charged Casillas substantively for possessing two different dogs for dog fighting purposes. All three offenses are distinct, and so imposing consecutive sentences for each count would not result in multiple punishments for the same offense. It has long been the rule that a substantive crime (such as possession of dogs for dog fighting), and a conspiracy to commit that crime, are not the "same offense" for double-jeopardy purposes because the conspiracy charge seeks to punish the agreement to do the illegal act, distinct from the act itself. As to the substantive possession counts, the relevant unit of prosecution is each individual dog, not any number of dogs, as Casilla-Montero contends. This understanding is supported by the text and legislative history of the

Animal Welfare Act. It was therefore not erroneous for the court to impose consecutive sentences.

In sum, the district court reasonably determined that an 84-month term of imprisonment appropriately reflected the inhumane and extreme conduct of Casillas.

## ARGUMENT

A sentencing court must correctly calculate the applicable guideline range, consider the parties' arguments concerning the sentence they deem appropriate, and then exercise its discretion by considering the sentencing factors in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 50 (2007). On appeal, this Court reviews "sentencing decisions imposed under the advisory Guidelines, whether outside or inside the applicable [Guidelines sentencing range], for reasonableness," including procedural soundness and the substantive reasonableness of the sentence. *United States v. Contreras-Delgado*, 913 F.3d 232, 238 (1st Cir. 2019) (citations omitted). Casillas believes that his 84-month sentence is both procedurally and substantively unreasonable, and runs afoul of double-jeopardy principles. These contentions lack merit. The district court fully explained its sentence. The sentence was reasonable and grounded in the extreme cruelty and breadth of Casillas's participation in dog fighting. Finally, the sentence did not result in multiple punishments for the same offense.

## I.     The sentence was procedurally reasonable.

Casillas argues for the first time on appeal that his sentence is procedurally unreasonable in that the court inadequately explained its reasons for the upward variance. The Court should reject this argument for the reasons explained below.

### A.    Legal Standards and Standard of Review

A sentence is procedurally unreasonable if the court committed a procedural error "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51. 18 U.S.C. § 3553(c) provides that "[t]he court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence[.]" *United States v. Vargas-Garcia*, 794 F.3d 162, 166 (1at Cir. 2015). To satisfy that requirement, the court must identify the "main factors behind its decision." *United States v. Wright*, 101 F.4th 109, 118 (1st Cir. 2024). District courts need only identify the factors briefly, *United States v. Dávila–González*, 595 F.3d 42, 48 (1st Cir. 2010) (citation omitted), and "any holes in the judge's reasoning" can "be plugged" by comparing what the judge did with the parties' arguments and the Presentence Investigation Report, *United States v. Garay-Sierra*, 832 F.3d 64, 67 (1st Cir. 2016) (citation omitted).

Where a defendant has raised an objection to the procedural reasonableness of the sentence in the district court, and therefore preserved it for appeal, this Court reviews under an abuse of discretion standard whether the district court committed any procedural errors, such as "failing to consider the § 3553(a) factors," or "failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51 (citations omitted). Under the abuse of discretion standard, the Court reviews *de novo* "the sentencing court's interpretation and

application of the sentencing guidelines," while factfinding is reviewed for clear error. *United States v. Ruiz-Huertas*, 792 F.3d 223, 226 (1st Cir. 2015).

Where a defendant fails to make a contemporaneous objection to the sufficiency of the court's explanation, the defendant must instead show plain error. *Wright*, 101 F.4th at 118. This requires the defendant to "show (1) error, (2) plainness, (3) prejudice, and (4) an outcome that is a miscarriage of justice or akin to it." *Garay-Sierra*, 832 F.3d at 67 (citations and quotations omitted). The defendant must show "a reasonable probability that, but for the error, the district court would have imposed a different, more favorable sentence," including identification of "specific facts" showing "that the district court considered a significant improper factor, failed to consider a significant proper factor, or made a significant error in balancing the factors." *United States v. Medina-Villegas*, 700 F.3d 580, 583 (1st Cir. 2012) (citations and quotations omitted). This standard is difficult to meet and "is not appellant friendly." *Garay-Sierra*, 832 F.3d at 67 (citation omitted). Casillas did not object to the procedural reasonableness of his sentence below; the plain error standard accordingly applies to this claim.

Casillas asserts in passing, p. 33, that the plain error standard should not apply because there was no opportunity to object to the sentence, which was imposed in the evening after a long sentencing hearing, and that a request for an explanation would have been futile. This assertion ignores the fact that Casillas was on notice that the government was requesting an above-guideline range sentence, as the government had requested a 10-year term of imprisonment. *See, e.g.,* APP-200. Additionally, the court provided Casillas with *two* opportunities to make specific requests after it imposed the sentence. APP-232-33. The only request made by Casillas at that time was to be

designated for institution within the southern part of the United States. *Id.* Casillas did not preserve his claim that the sentence was procedurally unreasonable. In any event, Casillas's claim fails under either standard.

**B.      The district court fully explained the reasons it imposed the 84-month sentence on Casillas.**

The court was extremely thorough in detailing the specific facts that supported the imposition of the sentence. After considering all the relevant factors, the court explained that the guideline range of 12 to 18 months per count did not adequately reflect the seriousness of Casillas's extreme conduct. *See generally supra*, pp. 8-14. As detailed above, p. 12-13, the court acknowledged the violence inherent in dog fighting. The court explained, however, that Application Note 2 to the relevant Guidelines expressly permits a higher sentence when the "offense involved extraordinary cruelty to an animal beyond the violence inherent in such a venture (such as by killing an animal in a way that prolongs the suffering of the animal)." Statement of Reasons 4, Sept. 22, 2023, ECF No. 106. The court found that Casillas did just that here when he cruelly let dogs die without making any attempt to alleviate their suffering. *Id.* The court also found that the "number of fights and the duration of Mr. Casillas's involvement" in dog fighting made this case "extraordinary in nature." APP-224. Furthermore, the court noted that the dogs seized from Casillas were found in deplorable conditions, chained to the ground, with contaminated or no water, and no proper shelter, and suffering from multiple serious health conditions. APP-226-27; *see also* U.S. Supp. App. 20-23; U.S. Supp. App. 87-89.

Casillas asserts, pp. 26-34, that the court did not explain what specific facts it relied upon and listed only "generic" facts that are inherent in the offence itself. To the contrary, the record reflects that the district court considered the characteristics of the offense, as well as Casillas's actions. APP-221-22. The court made factual findings that Casillas's behavior was extreme and provided specific examples. The court noted two examples of Casillas's "extreme cruelty" beyond that inherent in dog fighting. APP-222. In 2018, Casillas "explained during a Facebook conversation that his dog lost due to a nosebleed that never stopped, and he did not stop the fight but instead le[t] the dog bleed out and die." *Id;* APP-142-43. Letting a dog remain in a fight until it dies is not normal, even for those involved in dog fighting. APP-144, 180-81. Additionally, after a July 2021 fight, "a video presented to the Court shows the dog breathing in agony that later died from the injuries he sustained during the fight." APP-222. The court "noted that no attempt to alleviate his suffering was observed." APP-222-23. Again, that is not normal. *See* APP-144, 180-81.

The court also expressly found that "[i]n this case, the number of fights and the duration of Mr. Casillas's involvement"—more than 35 years—"is extraordinary in nature." APP-224-25. The court noted specifically that Casillas had advertised a dog fighting event that "featured 24 fights—a number expert testimony informed the Court [during the sentencing hearing] is unprecedented in his experience." APP-222-23. The court also found that "he never acknowledged the suffering his crimes inflicted on living creatures" and that the dogs seized from his house "were in deplorable conditions."

APP-226-27. The court was thorough in identifying its reasons and the specific facts that it relied upon in issuing the sentence. APP-222-28.[3]

Casillas alternatively argues, pp. 32-33, that the cruelty of the enterprise and the condition of the dogs found after his arrest were inadequate to explain the degree of upward variance. To the extent this argument depends on Casillas's contention that the term of imprisonment for the three offenses should have been served concurrently, that contention is incorrect and is addressed further below, pp. 34-43. This argument also fails because it merely reflects a disagreement with the district court's weighing of the facts and relevant factors—in other words, a challenge to the substantive reasonableness of the sentence. As explained further below, pp. 24-33, simply asserting that the unique circumstances of his case were inadequate to support his sentence does not demonstrate that the sentencing court committed plain error or abused its discretion. This court accords "substantial respect" to the sentencing court's broad discretion to weigh the mandatory sentencing factors. *Contreras-Delgado*, 913 F.3d at 239.

---

[3] In addition to varying upward based on the specific facts on this case, the district court properly varied from the guidelines based on its disagreement with the guidelines' views on how serious of an offense dog fighting is and how severely it should be punished. Under *Kimbrough v. United States*, 552 U.S. 85, 91, 98 (2007), "judges can sentence outside the advisory-guidelines range not only (as *Booker* held) because of the nature and circumstances of the offense but also because of the nature of the guidelines themselves." *United States v. Flores-Gonzalez*, 86 F.4th 399, 423 (1st Cir. 2023). Here, the district court explained:

> its dissatisfaction with the irrationality of the animal fighting guideline provision. Just as the sentencing Judge expressed in *U.S. v. Hargrove*, 701 F.3d 156 (4th Cir. 2012), other than the criminal dog fighters in America, every other person in America would be shocked beyond belief that you could do what the defendant did and come out with a federal sentence of 12 to 18 months. . . . No one could defend that.

Statement of Reasons 4, Sept. 22, 2023, ECF No. 106; APP-225

Casillas's sparse allegation fails to show any procedural error on the part of the district court, let alone any procedural error that substantially prejudiced his rights.

Finally, Casillas asserts, pp. 19, 28-32, that the district court's revulsion and dissatisfaction with the Sentencing Guidelines would not justify the degree of upward variance that the court imposed and that, to the extent the court wished to vary, it should have followed Application Note 2. The record shows, however, that the court in fact drew from the rationale in Application Note 2 when applying the § 3553(a) factors in varying upward. Application Note 2 provides that "there may be cases in which the offense level determined under this guideline substantially understates the seriousness of the offense" such as where "the offense involved extraordinary cruelty to an animal beyond the violence inherent in such a venture (such as by killing an animal in a way that prolongs the suffering of the animal)" or where "the offense involved animal fighting on an exceptional scale (such as an offense involving an unusually large number of animals)." Application Note 2 to § 2E3.1. The district court explicitly cited to these two examples and made findings that here, Casillas killed dogs in an unusually cruel way by refusing to remove them from fights and declining to take steps to alleviate their suffering. APP-222. The court also found that Casillas was involved in fighting on an exceptional scale, for a very long time and by organizing fights involving unprecedented numbers of dogs. APP-222-27. These circumstances fit precisely within the two situations outlined in Application Note 2 that warrant above-guideline range sentences. The district court thus made the appropriate findings and thoroughly explained the reasons for the sentence that it imposed.

In sum, Casillas fails to identify any procedural error committed by the district court in imposing the sentence.

## II. The sentence is substantively reasonable.

Casillas asserts, pp. 41-51, that his sentence is substantively unreasonable for three reasons. Casillas contends, pp. 44-45, that his actions did not warrant a higher sentence because they were within the "normal" range of cruelty inherent in dog fighting. Casillas also claims, pp. 41-43, 51, that it was unreasonable to impose an 84-month sentence on him to serve as a deterrent to others, particularly where prohibitions on animal fighting are not generally enforced in Puerto Rico. He also asserts, pp. 46-51, that the cases cited by the government in supporting its request for a 10-year sentence were distinguishable and create an unwarranted sentencing disparity with others convicted of similar crimes. These claims lack merit.

### A. Legal Standards and Standard of Review

"In most cases, there is not a single appropriate sentence but, rather, a universe of reasonable sentences." *United States v. Rivera-Gonzalez*, 776 F.3d 45, 52 (1st Cir. 2015). Appellate review is accordingly limited "to the question of whether the sentence, in light of the totality of the circumstances, resides within the expansive universe of reasonable sentences." *United States v. King*, 741 F.3d 305, 308 (1st Cir. 2014). The fact that an appellate court "might think some lesser sentence appropriate is not, in itself, a sufficient reason to disturb the district court's exercise of its discretion." *United States v. Del Valle-Rodriguez*, 761 F.3d 171, 177 (1st Cir. 2014). Instead, considerable deference is given to the district court's judgment. *United States v. Clogston*, 662 F.3d 588, 593 (1st Cir. 2011); *Contreras-Delgado*, 913 F.3d at 239 (citing cases).

Reviewing courts are "highly deferential," including when the sentence falls above the applicable guideline range. *United States v. Vázquez-Martínez*, 812 F.3d 18, 26 (1st Cir. 2016) (quotation omitted); *see also United States v. Gallardo-Ortiz*, 666 F.3d 808, 811 (1st Cir. 2012) ("A dramatic variance . . . cannot unduly influence our review of substantive reasonableness."); *Gall*, 552 U.S. at 51 (reviewing courts afford "due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance."). The district court need only provide "a plausible sentencing rationale and a defensible result." *Contreras-Delgado*, 913 F.3d at 239 (citations omitted).

### B.     Casillas's conduct was extreme.

The district court provided a detailed and appropriate sentencing rationale. *Ruiz-Huertas*, 792 F.3d at 228. As explained in detail above, pp. 8-14, Casillas engaged in a series of extremely cruel actions over the course of decades. He was a legend in the dog fighting industry, participating in more than 150 dogfights. People asked for his autograph and asked him for advice. One of the fights he organized and advertised included an unprecedented 24 matches. He sold dogs for profit while keeping them in deplorable conditions. It was his practice, contrary to common dog fighting practices, to let dogs die agonizing deaths after fights, and evidence presented at sentencing showed his cruel practice of letting dogs slowly dying, without him doing anything to ameliorate their suffering. He did not express remorse over his inhumane treatment of dogs, even when asked specifically by the district court. The district court considered all of these and other relevant facts when imposing the sentence, including factors that warranted leniency, such as Casillas's age, physical and mental health conditions, and

family and community ties, as well as his eldest son's mental health condition. Statement of Reasons 4, Sept. 22, 2023, ECF No. 106. The 84-month sentence is therefore substantively reasonable.

Casillas asserts that his actions were not extraordinarily cruel or extreme in their scope and duration, but the sentencing record flatly contradicts this assertion. Testimony at the sentencing hearing showed that it was not "ordinary" as Casillas claims, p. 44, to routinely leave losing dogs to die in a fight without taking any steps to alleviate their suffering. *See supra* pp. 6, 8. In fact, testimony showed that it was very uncommon for dogfighters to customarily refuse to save losing dogs in whom they had invested time and money and for which breeding opportunities existed for further profits. APP-143, 222. Casillas provided no evidence to the contrary at sentencing, nor does he provide any on appeal.

He also claims, p. 45, that the admittedly deplorable conditions in which the dogs were found on his property reflect only ordinary neglect, not extraordinary cruelty. This bare assertion does not show, however, that the district court abused its discretion in concluding that keeping dogs in such appalling conditions—chained to the ground, with contaminated or no water, without proper shelter to protect them from the hot sun, and infected with parasites and covered in pustules—was extremely cruel, and not necessarily part of the violence inherent in dog fighting. *See* APP-226-27. The multiple health conditions they were diagnosed with were "serious." APP-227.

Casillas further asserts, p. 45, that the fact that he had only four dogs when he was arrested shows that he was no longer involved in dog fighting on an exceptional scale. This assertion ignores the fact that his sentence reflects his more than 35 years of

participating in over 150 dogfights—facts that were charged as part of the conspiracy count and to which Casillas admitted when he pleaded guilty. *See* APP-23; U.S. Supp. App. 118; APP-221-27. It strains credulity to assert that the circumstances here were ordinary.

Casillas passingly asserts, p. 50, that the district court erred when it relied on a lack of contrition as a basis for a higher sentence while previously reducing the guidelines calculation for acceptance of responsibility. This assertion misunderstands the district court's reasoning. The court found that Casillas demonstrated acceptance of responsibility by pleading guilty and accordingly reduced the offense level by three levels pursuant to Guidelines § 3E1.1(a) and (b). APP-220. The court noted, however, that Casillas erroneously stated during his presentencing interview that, among other things, the dogs that lost fights were given away. APP-226. All the evidence presented showed that Casillas did not give away losing dogs. It was in fact his practice—as evidenced by Casillas's own words introduced as government exhibits—to never "pick up" (that is, save) a losing dog. U.S. Supp. App. 14, 84. The court also observed that Casillas made statements suggesting that he experienced remorse because he was caught, not because he believed dog fighting was wrong (*i.e.*, he stated that he never thought this would happen to him and that people in prison were murderers). APP-226; Presentence Investigation Report 8, ¶ 35, June 27, 2023, ECF No. 88. The court found that, even after Casillas was specifically asked, "he never acknowledged the suffering his crimes inflicted on living creatures." APP-226; APP-216-17. The district court's choice of sentence acknowledged that even though Casillas had pleaded guilty,

he failed to accept responsibility for certain of the harms that he caused (to wit, the suffering to animals). This nuanced approach is reasonable and defensible.

Casillas's contentions do not provide a basis for reversing the district court's well-founded variance. *United States v. Martin*, 520 F.3d 87, 96 (1st Cir. 2008).

### C. Deterrence justifies a variance sentence here.

In another attempt to avoid responsibility for his actions, Casillas appears, pp. 41-43, 51, to blame his conduct on the government's "lack of enforcement" of animal fighting laws. *See* Op. Br. at 43 ("The lack of enforcement—both federal and local—allowed Mr. Casillas to come before the court with a 35-year history."). But Casillas chose to be an international dog fighting mentor and fight organizer. He chose to chain dogs to treadmills, fill them with steroids, and ship them around the globe for hours-long fights. He decided not to remove losing dogs from fights and to let them suffer and bleed to death. Casillas is responsible for his own conduct, not the government.

Casillas further asserts, pp. 41-43, 51, that the government's general lack of enforcement and desire to deter members of the community from dog fighting makes the variance sentence unfair. But the "need for general deterrence is a permissible factor to consider" at sentencing. *United States v. Pagan-Walker*, 877 F.3d 415, 417 (1st Cir. 2017). The statute, 18 U.S.C. § 3553(a)(2)(B), in fact provides that sentencing courts should "afford adequate deterrence to criminal conduct." Here, the district court expressly identified the need for deterrence as one of the reasons for the variance. Statement of Reasons 3, Sept. 22, 2023, ECF No. 106. At the hearing, the court suggested through questioning that a larger sentence for dog fighting could do more to refute the public perception that these kinds of cases are not enforced or that the

Animal Welfare Act is a law that can be ignored more than other crimes. APP-206. Regardless, consideration of the need for deterrence was not the only or even the primary reason identified by the court as the basis for the upward variance. In imposing the upward variance, the district court focused primarily on Casillas's extreme cruelty and extensive participation in dog fighting activities. *See supra* pp. 13. That alone would have justified the 84-month sentence.

### D. Casillas's conduct was like that of other defendants who received above-Guidelines sentences.

District courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The statute's main concern is minimizing national sentencing disparities among "like criminals who commit like crimes." *United States v. Romero*, 906 F.3d 196, 211 (1st Cir. 2018). Casillas asserts, pp. 44-51, that the cases cited by the government in supporting its request for a 10-year sentence were distinguishable and that treating him like the defendants in those cases created an unwarranted sentencing disparity.

The government requested a 120-month (10-year) term of imprisonment for Casillas. In support, the government cited cases in which courts sentenced regionally or nationally significant dogfighters to the statutory maximum penalty of 60 months or more in cases involving multiple counts of conviction. *See* U.S. Supp. App. 3-5 (citing cases); *see* Sentencing Transcript*, United States v. Anderson*, No. 3:13-cr-100 (M.D. Ala., Nov. 7, 2014), ECF No. 723 (sentencing lead defendant to 60 months for a dog fighting conspiracy charge to be served consecutively with a 36-month sentence for the

substantive charges of sponsoring and exhibiting a dog in an animal fighting venture); Judgment, *United States v. Allen*, 3:13-cr-100 (M.D. Ala. Nov. 12, 2014), ECF No. 581 (same case, sentencing second most culpable co-defendant to statutory maximum penalty of 60 months on one dog fighting count); *United States v. Hargrove*, 701 F.3d 156, 159-160 (4th Cir. 2012) (affirming 60-month sentence imposed on single dog fighting count for 78-year old defendant who had been a prolific dog fighter, where Guidelines range was zero to six months); *United States v. Richardson*, 7:16-cr-122, 2017 WL 6055773, *2-3 (E.D.N.C. Dec. 1, 2017) (varying upward from 12-18 month guideline range to 96-month sentence on two dog fighting counts due to the defendant's "striking" involvement in dog fighting, as well as evidence relating to his uncharged illegal drug selling activities), *aff'd*, 796 Fed. App'x 795, 803 (4th Cir. Dec. 12, 2019); *United States v. Chadwick*, 7:16-cr-122, 2017 WL 6055384, *2-3 (E.D.N.C. Dec. 7, 2017) (same case, upward variance from 12-28 month Guidelines range to 60-month sentence on single dog fighting charge, with no reliance on any uncharged drug activities), *aff'd*, 796 Fed. App'x 795, 803 (4th Cir. Dec. 12, 2019); *United States v. Jarvis*, No. 22-10528 (11th Cir. 2024) (affirming sentence of 60 months concurrent to those for drug dealing) (APP-48-51).

Casillas argues, as he did at sentencing, pp. 46-51, that those cases are distinguishable because they involve other crimes relating to drugs or guns or involved larger numbers of dogs and more dog-fighting paraphernalia. Review of those cases, however, shows that they provide a useful point of comparison. The 96-month total sentence in *Anderson*, for example, was imposed for Anderson's participation in the conspiracy to engage in dog fighting and for the substantive dog fighting charges

themselves. *See, e.g.,* Amended Judgment, *United States v. Anderson*, No. 3:13-cr-00100 (M.D. Ala. Feb. 3, 2015), ECF No. 681 (96-month sentence was imposed for substantive dog fighting charges). The transcript of sentencing makes clear that the judge imposed the sentence because of Anderson's extensive participation in dog fighting. *See, e.g.,* Sentencing Transcript at 73-85, *United States v. Anderson*, No. 3:13-cr-00100 (M.D. Ala. Nov. 7, 2014), ECF No. 723. Casillas asserts, pp. 44, 47, that Anderson's actions were more extreme than his because Anderson electrocuted dogs after fights, but the *Anderson* judge made no findings that Anderson himself had electrocuted any dogs. *See* Sentencing Transcript at 81, *United States v. Anderson*, No. 3:13-cr-00100 (M.D. Ala. Nov. 7, 2014), ECF No. 723. In fact, the transcript shows that, in some ways, Casillas's participation in dog fighting was more extreme than Anderson's. Evidence showed Anderson hosted 22 fights (although he participated in more) and had 114 dogs seized at his property. *Id.* at 75, 80-81. Casillas's participation was likewise extensive: he participated in more than 150 fights over more than 35 years. *See supra* pp. 5-8. He organized one fight with 24 matches, which the federal agent testified was an unprecedented number. Casillas also made it a practice never to save a dog, and video and documentary evidence presented at sentencing showed that Casillas let dogs die in agony. *See supra* pp. 6, 21. Casillas's actions were comparable to—if not worse than—those of Anderson.[4]

---

[4] For similar reasons, Casillas's actions were comparable to or worse than the defendant in *United States v. Chadwick*, 7:16-cr-122, 2017 WL 6055384, *2-3 (E.D.N.C. Dec. 7, 2017).

Another defendant (Allen) in the same case as Anderson was sentenced to a 60-month total term of imprisonment on one dog fighting count. *See* Sentencing Transcript at 53-54, *United States v. Allen*, No. 3:13-cr-100 (M.D. Ala. Nov. 5, 2014), ECF No. 754. Allen was considered "the biggest dogfighter in what is one of the biggest conspiracies ever discovered in this country." *Id.* at 49-50. Casillas claims, p. 47, that the upward variance reflects that Allen also sold drugs. But the transcript reflects that Allen was sentenced to 60 months on the dog fighting count only and that the judge varied upwards from the guidelines range largely because the offense involved extraordinary cruelty to animals that resulted in death or maiming of hundreds of animals. *Id.* at 52.

Moreover, to the extent that certain cases (*i.e.*, *Richardson* and *Jarvis*) cited by the government involved drug or gun crimes in addition to the dog fighting charges, the district court agreed with Casillas that the "nexus" to drugs and gun present there "was not present in this case" and "[took] this distinction into consideration" when imposing the sentence that was 36 months lower than what the government had requested. APP-226-27. The district court nevertheless found that Casillas's involvement in dog fighting was extraordinary, making express findings about his extreme cruelty and the long duration and broad extent of his participation. APP-223-24. Due to the similarities in the extreme nature of Casillas's conduct and the conduct outlined in the other cases, the 84-month sentence imposed here was not an outlier. Moreover, Casillas points to no other defendants who have engaged in dog fighting as extensively as he has who received lesser sentences. *Cf. United States v. González-Barbosa*, 920 F.3d 125, 131 (1st Cir.

2019) (a claim of sentencing disparity "must compare apples to apples").[5] The district court's rationale is more than sufficient to justify the 84-month sentence.

He also contends, p. 49-50, that the district court overweighed his criminal history. The record shows, however, that the district court did not unduly focus on his criminal history. After reviewing other components of Casillas's personal background, the district court simply explained that this offense was "Mr. Casillas's fifth known arrest and third conviction, and he has a reported history of marijuana use since 1996." APP-222. The court continued that "[h]e has previous convictions for illegal possession of a firearm and controlled substances." *Id.* There is no support for Casillas's contention that the district court overstated the seriousness of his criminal history.

In sum, the district court did not abuse its discretion at sentencing.

## III. The sentence violated neither the Guidelines' concept of grouping nor the constitutional protection against double jeopardy.

The district court imposed a 36-month sentence for Count 1, 24 months for Count 3, and 24 months for Count 5, and ordered the terms of imprisonment for the three counts to be served consecutively for a total sentence of 84 months. Casillas contends, pp. 35-40, that the consecutive sentences result in the imposition of multiple

---

[5] Casillas also cites, p. 47, to another case, *United States v. Meyers*, No. 21-13891, 2024 WL 914874 (11th Cir. Mar. 4, 2024), Casillas Supplemental Appendix 52-56, in which the Eleventh Circuit held that a district court erred in imposing a 123-month sentence when it relied upon a fact that the defendant had disputed at sentencing (specifically, whether the defendant had killed one of his dogs by hanging it), without resolving the factual question. *Meyers* (decided after the sentence was imposed here) is distinguishable because Casillas did not dispute any of the underlying facts presented by the government at sentencing. In any event, the *Meyers* district court reimposed the same 123-month sentence on remand. *See* Amended Judgment, *United States v. Meyers*, No. 1:18-cr-58-LAG-ROL (D. Ga. Aug. 26, 2024), ECF No. 619.

punishments for the same offense in violation of both the Guidelines and the Constitution. Casillas specifically contends that the Count 1 conspiracy encompassed the possession of dogs charged in Counts 3 and 5, making him punishable for only one offense. He also asserts that, irrespective of Count 1, it was erroneous to impose consecutive sentences for Counts 3 and 5, as the unit of prosecution is not individual dogs, but any number of dogs. Both contentions fail.

## A.    Legal Standards and Standard of Review

The guidelines and the Constitution both impose rules on sentencing a defendant convicted of multiple offenses. Guideline § 3D1.2(c) provides that the court should group counts "when one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." Grouping offenses permits the calculation of one offense level that encompasses all the counts for which the defendant is convicted, in part to provide incremental punishment for additional criminal conduct and in part to prevent "double counting" by ensuring that a defendant is not punished, either directly or through an adjustment, for the same underlying offense in separate but "closely related" charges. U.S.S.G. § 3D1.2 Comment n. 5; U.S.S.G. Ch. 3, Pt. D, Refs & Annos. The guidelines also permit the imposition of consecutive sentences for multiple counts. *See, e.g.,* U.S.S.G. § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.").

Apart from the guidelines, a sentence is "multiplicitous" for constitutional purposes when a defendant is sentenced more than once for the same offense. *United States v. Smith*, 919 F.3d 1, 15 (1st Cir. 2019). The "prohibition against multiplicitous prosecution derives from the Double Jeopardy Clause," which bars multiple punishments for the same offense. *United States v. Gordon*, 875 F.3d 26, 32 (1st Cir. 2017). When a defendant asserts a claim of multiplicity, the court must determine whether there is a sufficient factual basis to treat each count separately. *Smith*, 919 F.3d at 15 (quotation omitted). This analysis begins by identifying the statute's "unit of prosecution," *id.*, a question that depends on statutory text and legislative intent. *See, e.g., Bell v. United States*, 349 U.S. 81, 83 (1955) (analyzing the "will" of Congress in "defining what it desires to make the unit of prosecution").

Casillas failed to preserve these challenges because he did not raise them in the district court. *United States v. Nueci-Pena*, 711 F.3d 191, 196 (1st Cir. 2013). Casillas never objected to the three counts of the indictment on the grounds that they were multiplicitous; nor did he object to imposition of consecutive sentences at the sentencing hearing. Indeed, he pleaded guilty to the three counts and agreed to the predicate facts for each offense. Review is accordingly for plain error. *Id.* at 197.

## B.    The district court complied with the Guidelines.

Count 1 charged Casillas with conspiracy to attend and sponsor dogs in an animal fighting venture and conspiracy to buy, sell, deliver, possess, train, and transport dogs for participation in an animal fighting venture, all in violation of 7 U.S.C. § 2156(a)(1) & (2), 2156(b) and 18 U.S.C. § 49 and § 371. APP-17-24. Counts 3 and 5 charged Casillas with possessing two *different* dogs for use in dog fighting at his property in Humacao,

Puerto Rico, in violation of 7 U.S.C. § 2156(b) and 18 U.S.C. § 49. Section 2156(a) and (b) make it unlawful for a person to sponsor an animal in an animal fighting venture or to attend an animal fighting venture. Section 2156(b) makes it "unlawful for any person to knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an animal fighting venture." Those sections are enforced through 18 U.S.C. § 49, which provides that whoever violates subsection (a), (b), (c), or (e) of section 26 of the Animal Welfare Act shall be fined under this title, imprisoned for not more than 5 years, or both, for each violation. The conspiracy provision, 18 U.S.C. § 371, makes it unlawful for persons to conspire either to commit any offense against the United States" and provides that if "one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

The Presentence Investigation Report calculated one offense level for all three counts because "the offense was ongoing or continuous in nature and the guideline was written to cover such behavior." Presentence Investigation Report 9, June 27, 2023, ECF No. 88. This was consistent with U.S.S.G. § 3D1.2 and Casillas does not contend otherwise. Casillas instead asserts, pp. 35-36, that the sentences for all three counts should have run concurrently because the offenses were grouped under Guideline § 3D1.2 for purposes of calculating the guideline range. He also seems to suggest, p. 36, that the only permissible situation in which a district court can impose consecutive sentences is under Guideline § 5G1.2(d), which applies only if consecutive sentences are "necessary to produce a combined sentence equal to the total punishment" calculated under the guidelines. Here, the guidelines range for the grouped offenses was

12-18 months, and so, in Casillas's view, there was no need to impose consecutive sentences under the circumstances outlined in Guideline § 5G1.2(d).

The imposition of consecutive sentences here did not contravene these guidelines. Neither of the two guidelines cited by Montero contain language prohibiting the imposition of consecutive sentences. The guidelines "do not control whether sentences run concurrently or consecutively." *United States v. Jarvis*, 606 F.3d 552, 554 (8th Cir. 2010). Judges have long been understood to have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences that they impose. *Setser v. United States*, 566 U.S. 231, 236 (2012); 18 U.S.C. § 3584(a) (restricting only the imposition of consecutive sentences only in the case of attempt and the substantive offense that was the objective of the attempt). And courts may in fact impose consecutive sentences for multiple counts even if the counts are grouped for sentencing guidelines purposes. *See United States v. Garcia-Torres,* 341 F.3d 61, 75 (1st Cir. 2003). The district court acted consistently with the guidelines when imposing consecutive sentences for the three counts.

### C. Consecutive sentences for the conspiracy and substantive counts did not violate double jeopardy principles.

Casillas contends, pp. 35-36, that the conspiracy count encompasses the possession of dogs counts and that there was accordingly only one offense for which he could be punished. It is true that the possession of two different dogs in October 2022 for dog fighting purposes charged in Counts 3 and 5 were among the overt acts included in the Count 1 conspiracy charge. APP-23. It has long been the rule, however, that "a substantive crime, and a conspiracy to commit that crime, are not the 'same

offense' for double jeopardy purposes." *United States v. Flores-Rivera*, 56 F.3d 319, 327 n.5 (1st Cir. 1995) (citing cases). This is because the agreement to do the illegal act is "distinct from the act itself." *Id.* (citations and quotations omitted). It therefore does not offend the Constitution to impose separate, consecutive punishments for the conspiracy and the possession of dogs counts. Casillas cannot demonstrate any plain error committed by the district court in imposing the sentence for Count 1 consecutively with the sentences for Counts 3 and 5.

### D. The district court correctly imposed consecutive sentences for the separate offenses identified in Counts 3 and 5.

Casillas also asserts that Counts 3 and 5 are one offense, such that it was erroneous to impose consecutive sentences for each of those two counts. He asserts that the use of the word "any" in Section 2156(b) means that the simultaneous possession of multiple fighting dogs only amounts to one punishable violation. In his view, "any" includes as many animals as one person possesses at a single time, rather than focusing on a single animal. This argument fails because it is inconsistent with both the text and intent of the statute.

Casillas's suggested interpretation is inconsistent with the remainder of the text in Section 2156(b), as well as with the text in other subsections of Section 2156. In whole, Section 2156(b) makes it unlawful to possess "*any* animal for purposes of having *the animal* participate in an animal fighting venture." 7 U.S.C. § 2156(b) (emphasis added). The use of the definite article "the" in the phrase "the animal" shows that Congress intended the unit of prosecution to be an individual animal,

rather than more than one animal. *See Hernandez v. Williams*, 829 F.3d 1068, 1074 (9th Cir. 2016) (employing use of the definite article to aid statutory interpretation).

Casillas's view is also inconsistent with other subsections of Section 2156, all of which focus on individual animals. Section 2156(a)(1), for example, makes it illegal to "sponsor or exhibit *an animal*"—that is, a single animal—in an animal fighting venture. 7 U.S.C. § 2156(a). Section 2156(c) similarly makes it unlawful for a person to use the mail service of the United States Postal Service to advertise "*an animal*"—again, a single animal—for use in an animal fighting venture. *Id.* § 2156(c); *see also id.* § 2156(d) (referring to "a bird" in the singular). The definition of "animal" in Section 2156(f)(4) as "any live bird, or any live mammal, except man," makes clear that the term "any" is best understood as referring to any *type* of animal—not any *number* of animals.

Congress' use of the singular throughout Section 2156 reflects that Congress intended to protect individual animals. Congress prohibited animal fighting "to increase the protection afforded animals[] in transit and to assure humane treatment of certain animals." Animal Welfare Act Amendments of 1976, Pub. L. No. 94-279, 90 Stat. 417 (1976). The House Committee Report focused extensively on the physical suffering that the dogs often endure in fighting ventures. H.R. Rep. 94-801, at 9. And Congress did not simply prohibit the conduct it deemed harmful: it empowered the government to seize the animals involved and required it to provide "[n]ecessary care including veterinary treatment" to the animals used in these crimes, indicating concern for the welfare of each individual animal. *Id.* § 2156(e).

Given the statute's text and purpose, it makes sense to punish violations based on harm to individual animals. Suffering is experienced individually, not collectively.

Each individual fighting dog may suffer a miserable life "without basic nutrition, shelter and healthy socialization with humans and other animals." *Berry*, 2010 WL 1882057, *4. Each dog may be starved, "beat[en,] and goaded on a daily basis in order to raise the dog's tolerance towards pain and increase the 'fight' " or aggression "within the dog." *Id.* If more than one dog suffers, there is more suffering. The logical outgrowth of Casillas's view is that the suffering of the second, third, fourth, etc. dog does not matter. But harm to individual animals is the type of harm sought to be prevented by the prohibition on possession in Section 2156(b). It accordingly makes sense that someone who injures more than one animal should be punished more than someone who injures only one. *See United States v. Anderson,* Sentencing Transcript at 77-78, 3:13-cr-00100 (ECF No. 723) (October 31, 2014) (explaining that the "guidelines in this case are deficient in that they do not account for multiple dogs, multiple fights, or the injuries that that dogs suffered"; "if you had one dog, one fight, you're looking at the same guideline range as if you had 100 dogs and 100 fights," which "does not make sense, because there is no incremental punishment").

Casillas attempts, p. 38, to analogize this case to *United States v. Rodriguez,* 525 F.3d 85 (1st Cir. 2008), in which this Court held that the imposition of consecutive sentences under 18 U.S.C. § 924(c) for two acts of firearm possession during a single predicate drug crime impinged upon double jeopardy principles. But that case is distinguishable. In *Rodriguez,* there was one predicate drug offense, *Rodriguez,* 525 F.3d at 111, and the relevant statute, 18 U.S.C. § 924(c), provided terms of imprisonment (that were in addition to the punishment provided for the underlying crime) for any person carrying a firearm *in relation to* any crime of violence or drug trafficking. Here,

by contrast, Casillas did not possess the two separate dogs for dog fighting purposes that were identified in Counts 3 and 5 merely *in relation to* a separate substantive crime of dog fighting; the possession of each individual dog instead constitutes a separate substantive crime. APP-25-26. Moreover, unlike in *Rodriguez*, Casillas pleaded guilty to those two separate counts and the factual predicates underlying them. *See United States v. Grant*, 114 F.3d 323, 329 (1st Cir. 1997) ("When a criminal defendant pleads guilty, he admits not only that he committed the factual predicate underlying his conviction, but also that he committed the crime charged against him.") (citations and quotations omitted). He therefore "concede[d] that he has committed two separate offenses." *Grant*, 114 F.3d at 329 (citation omitted). He was questioned extensively about his admission of guilt to these two counts and the court clarified that he was, in fact, agreeing that he committed those crimes. U.S. Supp. App. 123-28. By contrast, he contested and did not plead guilty to the other two dog possession counts, which were dismissed as part of his plea agreement. U.S. Supp. App. 127-28.

The other case cited by Casillas, pp. 38-39, is also inapposite. In *United States v. Bell*, 349 U.S. 81 (1955), the statute was ambiguous as to whether the act of transporting more than one woman at a time would constitute two offenses: it prohibited only the transportation of "any woman or girl for the purpose of prostitution" without specifying whether the unit of prosecution was the transportation or the person. The Supreme Court therefore applied the rule of lenity, leading the Court to resolve doubt in favor of the defendant and "against turning a single transaction into multiple offenses." *Id.* at 84. The rule of lenity, however, "applies only when, after consulting traditional canons of statutory construction, [the court is] left with an ambiguous

statute." *Shular v. United States*, 589 U.S. 154, 165 (2020). The statute here is not ambiguous. Unlike in *Bell*, the Animal Welfare Act plainly refers to individual animals through use of the definite article in the phrase "the animal," leaving no room for principles of lenity to apply. *See supra* pp. 39-40. The *Bell* decision also suggests that Congress' focus in enacting the statute was limiting interstate transportation "in aid of social morality," *Bell*, 349 U.S. at 83, as opposed to the focus on protecting individual victims evident in the Animal Welfare Act.

In any event, to the extent the district court erred in applying the sentences for Counts 3 and 5 consecutively, Casillas cannot demonstrate that the error affected his substantial rights or seriously affected the fairness, integrity, or public reputation of judicial proceedings. The 24 months that were imposed on each of Counts 3 and 5, when added together (48 months), are less than the statutory maximum of 60 months (five years) for one count. *See* 18 U.S.C. § 49. The district court could have reasonably exercised its discretion by sentencing him to a term of 48 months for either of the two counts alone based on his extreme cruelty and extraordinary participation in dog fighting activities. *See supra* pp. 24-33.

In sum, the district court did not run afoul of the Guidelines or principles of double jeopardy when it imposed consecutive sentences for Counts 1, 3, and 5.

## CONCLUSION

For the foregoing reasons, the district court's judgment ordering Casillas to an 84-month term of imprisonment should be affirmed.

Respectfully submitted,

*/s/ Thekla Hansen-Young*

W. STEPHEN MULDROW
*U.S. Attorney*

TODD KIM
*Assistant Attorney General*

JONATHAN L. GOTTFRIED
*Assistant U.S. Attorney*
U.S. Attorney's Office
District of Puerto Rico

RACHEL HERON
ETHAN C. EDDY
ALLEN M. BRABENDER
THEKLA HANSEN-YOUNG
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

September 30, 2024
DJ # 198-17486

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,071 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Garamond font.

/s/ *Thekla Hansen-Young*
Thekla Hansen-Young

Counsel for Federal Appellees

September 30, 2024